[Civ. No. 10563. Second Appellate District, Division One.—June 17, 1936.]

JAMES L. DARNELL, Respondent, v. LEONARD J. WOODRUFF, Appellant.

W. I. Gilbert for Appellant.

Francis B. Cobb for Respondent.

DESMOND, J., *pro tem.*—From a judgment secured by plaintiff in a trial without a jury, defendant appeals upon the grounds that the court erred in ruling upon points of law occurring in the course of the trial and in making certain findings upon which the judgment rests, which are contrary to or not justified by the evidence. Despite the formidable presentation of this appeal by means of a voluminous transcript and a book of exhibits exceeding five hundred printed pages, we find, upon analysis, a comparatively simple case.

The defendant struck oil in Oklahoma in 1919 and before the close of 1922 had received income from that source amounting to more than a million dollars. In 1927 he employed plaintiff, an income tax specialist, to represent him before the department of internal revenue at Washington, his property having been attached for a claimed failure in respect to his income tax return, five years previously, in the year 1922. Plaintiff, at the time of this employment, was a consultant in tax matters for Standard Oil Company of New Jersey, and also for the company to which defendant had leased his oil land on a 50 per cent royalty basis, namely, Carter Oil Company, owned by the Standard Oil Company of New Jersey. By reason of this connection, plaintiff, having access to production figures and other data, was in position to present to the government claims for depletion in behalf of defendant and his wife. For this he rendered a bill "for services, traveling and hotel expenses, telegrams and telephone", amounting to $2,619,53, which was paid without demur. Defendant testified, as to the year 1923, that he would estimate his gross income at $200,000; as to 1925, $75,000 less—$125,000. "I couldn't give an approximation of within a hundred thousand dollars. I don't think I kept any books or records showing those facts in 1925; I did in 1926 and 1927. I employed Mr. Gardenhire in the latter part of the year 1926 and all

of 1927 and he quit in the spring of 1928. He was my private secretary and bookkeeper. I don't know whether he destroyed those books or not.'' Notwithstanding that he engaged in business on a large scale during 1925 and in subsequent years, holding a great many oil leases in Oklahoma, owning ranches and homes in several different states, having accounts in a goodly number of banks, buying and selling stocks and bonds, and as a side line, carrying on a business dealing in antiques, having during at least a part of the time the assistance of a secretary-bookkeeper, and having had prior direct contact with the internal revenue department, this defendant failed to file an income tax return for the years 1925, 1926, 1927, 1928, 1929 and 1930. The department in 1931 endeavored, by every reasonable means, to get him to make a report on this matter, forwarding its communications by registered mail and having a representative interview him, all to no avail. At last, the final notice, advising him of impending distraint proceedings, bringing no response, the defendant claiming to be ill then and on other occasions, the internal revenue collector for the Southern California District in early December attached his property, including an active account with a stockbroker, running into many thousands of dollars. Defendant immediately, on December 7, 1931, wired the plaintiff at his New York office telling him of his predicament and closing with the words: ''I want to employ you immediately to represent me in this matter as in the past.'' The plaintiff undertook the employment, asking for and receiving a retaining fee of $500 and on December 9th, left New York for Washington. Two days later he advised defendant by wire as follows: ''I have done the best I could in the department, and on my assurance that the matter of the determination of your tax would be gone into at once so that your true liability could be determined, they are wiring the . Collector this morning asking him to try to arrange things so that you can at least turn around.'' Immediately afterward the government representative called upon defendant and arranged for a brief postponement of action which, upon the posting of a bond, as suggested by plaintiff, became an indefinite postponement, the result being that distraint proceedings were abandoned and a settlement ultimately effected with the government.

The distraint action was based upon income calculations made by the government for the years 1923 to 1929, both inclusive, which amounted to $278,155.71, plus penalties of $69,538.93, and interest approximating $110,564, a total of $458,258.64. To this might be added a fraud penalty of 50 per cent of the basic tax.

Following his successful work in Washington, the plaintiff came to Los Angeles and there, absenting himself entirely from his New York office, spent a period of several months on various occasions in the succeeding year in going over a ten years' accumulation of correspondence, checks and document of all kinds in an endeavor to reconstruct a set of books that would reflect as well and completely as possible the business done by defendant in the questioned years. Plaintiff was assisted by an examining agent of the internal revenue department and these two men spent many weeks sorting and checking the papers and making records thereof. Most of the work was done at defendant's house, under circumstances described by plaintiff in a letter addressed to the commissioner of internal revenue on January 19, 1933, as follows: "As might be expected, the man's financial affairs are, or rather were, in unbelievable confusion. He has never kept books. At intervals he has had an employee or two who has tried to get his business into some kind of order, but he has been distrustful and suspicious and not much was ever accomplished. He has never checked a bank statement, and many of his checks, some for considerable amounts are untraceable. Fortunately he has never destroyed a paper of any kind, but there has never been any systematic filing. Armloads of documents of all kinds, some valuable, many worthless, were found in all sorts of unexpected places all over the house and the store."

In this same letter, plaintiff sought to satisfy the government that, notwithstanding appearances, defendant was essentially honest, stating "he knew at the end of each year that he had less money than he had at the beginning, and as a consequence had no taxable income and hence owed no taxes. He honestly and sincerely believed that inasmuch as he owed nothing, there was no obligation on his part to file a return. When the liens and attachments on his property were filed in December, 1931, he was astonished and dismayed." Plaintiff actually secured from the department of

internal revenue abatement of the 50 per cent penalty recommended by the examining agent for fraud practiced upon the government by defendant. His success in having this civil penalty waived "on the ground that there is no fraud or fraudulent intent" takes on special significance when we consider the criminal action that may result from fraudulent failure to make a return. "Any person required . . . to make a return . . . who wilfully fails to . . . make such return . . . at the time or times required by law . . . shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution." (26 U. S. C. A., sec. 1265.)

 In addition to saving his client from a civil penalty and a possible criminal prosecution, plaintiff so successfully handled the business entrusted to him in December, 1931, that by early spring of 1934, he was able to advise defendant that "Owing to my efforts the total amount of tax assessed stands now at $45,532.60. To this there will be added a mandatory penalty of $11,383.15, and the Government, if it so wishes, may add a further penalty of $22,766.30." The mandatory penalty represented 25 per cent of the basic tax for negligence; the possible additional penalty, 50 per cent for fraud. Estimating $25,000, as the amount of interest due, plaintiff notified defendant that he had been told by the department that "an offer in compromise of $80,000 would be entertained and recommended". Thus disposing of any claim for fraud penalties, plaintiff advised defendant to make the offer of compromise. This defendant declined to do. Instead, he went from Los Angeles to his former home in Ardmore, Oklahoma, there engaged his one-time secretary and bookkeeper, an accountant and an attorney, and with them proceeded to Washington and secured further consideration of the matters at issue in the internal revenue department. Witnesses that were never made available to plaintiff were produced before the officials of that department, and in due course, the basic tax against defendant was reduced from $43,232.08, the figure attained by plaintiff, to the amount of $25,765.49. Without a thought of minimizing the effective service rendered by the Oklahoma

attorney for which he received as a fee a portion of the sum of $13,100, incurred for services and expenses, we think it is apparent that his work performed in a few weeks had as its groundwork the set of books, reconstructed with painstaking care and great skill by plaintiff over a period of many months, and data assembled in the period December, 1931, to February, 1934, all of which was placed at the disposal of the attorney when defendant summoned plaintiff from New York to Washington to attend a conference preparatory to a new or further presentation of the case. On March 1, 1934, plaintiff presented his first bill for services and expenses, figuring the amount due for services $58,130.78, as 25 per cent of the difference between the original basic tax assessment and the final basic tax assessment which he had secured. In this suit upon *quantum meruit* he testified that this was only one method of estimating the value of his services, calling particular attention to the time spent upon the case away from his New York office, shown by an exhibit as 246 days in the year 1932, 64 days in 1933, and 9 days in 1934. In addition, he charged against this case 97 days in his office. Various income tax experts were called at the trial by both parties, some evaluating the services of plaintiff at more than the amount charged, some at less, and one, for the defendant, at less than nothing. There was evidence that plaintiff, prior to 1920, had been head of the natural resources division of the treasury department of the United States; that he then resigned, built up a remunerative practice which brought him for the period 1920 to 1927 averaged earned fees of more than $50,000 per year and thereafter to 1931 more than $25,000 annually. Other considerations bearing upon the reasonableness of the fees charged were called to the attention of the court; also the fact that during the time the case was handled by plaintiff, he had received on account the sum of $8,257.35. From all the facts and from the conflicting evidence before him, the trial judge found that there was due plaintiff from defendant for services performed a balance of $24,000 and entered judgment for that amount, by this decision recognizing the right of plaintiff to charge defendant with amounts which he had received in advance for hotel and traveling expenses incidental to the preparation and presentation of the income tax

634

case. ■ Appellant complains of this allowance, citing the case of *Tasker* v. *Cochrane,* 94 Cal. App. 361 [271 Pac. 503], to the effect that an attorney is bound to bear his own traveling expenses in the absence of a special agreement to the contrary. Respondent answers this complaint effectively by calling attention to the terms of employment proposed by appellant to respondent, "to employ you immediately to represent me in this matter as in the past", then showing that in the past respondent had rendered and appellant had paid a bill not merely for services performed in a case before the internal revenue department, but also for traveling, hotel and other expenses incidental to the work. We notice, too, that appellant in the early days of the employment forwarded $500 to respondent for expenses and shortly thereafter $1,000 on the report that "If you want me to do all this you should send me a check for one thousand dollars ($1,000) to cover my expenses, as the five hundred dollars ($500) already sent has been pretty much used up in my three trips to Washington, telephone, telegrams, etc." Incidentally, it may be pertinent to note that in the performance of his work, respondent made four trips from New York to California and return, several via Oklahoma, and seven trips to Washington.

■ We have failed to state that when this suit was instituted defendant filed a cross-complaint charging plaintiff with negligence, itemized as to many particulars in his handling of the income tax case; also, charging him in counterclaim with various faults, deficiencies, delinquencies and even conversion of personal property. The trial court made findings favorable to respondent on all material issues before it, including one that at the time of employment no sum was specified or agreed upon as a charge to be made by plaintiff for his services. We have examined with care these findings having in mind the specifications of error charged in relation to them and, considering the evidence adduced and the right and duty of the court to decide questions where a conflict in evidence arises, we find no error. Neither do we find any error in the rulings on law points arising during the trial. We note appellant's claim that the amount awarded respondent by the trial court is grossly excessive, and while we realize that a large part of the reduction claimed arose from returns that may have been filed in

error in the Baltimore office of the department of internal revenue, still, noticing the conduct of the case in other particulars, we cannot say that this judgment is excessive in amount. Under the circumstances, we do not feel that the action of the trial court in denying a new trial is subject to criticism.

The judgment is affirmed.

York, Acting P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 14, 1936.